Slip Op. 15-77

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| _____ : | | |
| FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC., | : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Before: Richard K. Eaton, Judge |
| UNITED STATES, | : : | Court No. 13-00236 |
| Defendant, | : : | |
| and | : : | |
| SHENZHEN XINBODA INDUSTRIAL CO., LTD. and HEBEI GOLDEN BIRD TRADING CO., LTD., | : : : : | |
| Defendant-Intervenors. | : : | |
| _____ : | | |

**OPINION**

[The Department of Commerce's Final Results are sustained.]

Dated: July 16, 2015

*John M. Herrmann*, Kelley Drye & Warren LLP, of Washington, DC, argued for plaintiffs. With him on the brief was *Michael J. Coursey*.

*Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Justin Ross Becker*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, of Washington, DC.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, DC, argued for defendant-intervenor Shenzhen Xinboda Industrial Co., Ltd.  With him on the brief was *J. Kevin Horgan*.

*Robert T. Hume*, Hume & Associates LLC, of Ojai, CA, argued for defendant-intervenor Hebei Golden Bird Trading Co., Ltd.

EATON, Judge: Before the court is the USCIT Rule 56.2 motion for judgment on the agency record of plaintiffs Fresh Garlic Producers Association and several of its individual members, Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc. (collectively, "plaintiffs").  Pls.' Mot. for J. on the Agency R. (ECF Dkt. No. 35).  By their motion, plaintiffs challenge the United States Department of Commerce's ("Commerce or the "Department") final results of the seventeenth annual administrative review of the antidumping duty order on fresh garlic from the People's Republic of China ("PRC").  Fresh Garlic From the PRC, 78 Fed. Reg. 36,168 (Dep't of Commerce June 17, 2013) (final results of antidumping duty administrative review; 2010–2011), and accompanying Issues and Decision Memorandum, PD 297 at bar code 3139858-01 (June 10, 2013), ECF Dkt. No. 28 ("Issues & Dec. Mem.") (collectively, "Final Results").

Defendant-intervenors Shenzhen Xinboda Industrial Co., Ltd. ("Xinboda") and Hebei Golden Bird Trading Co., Ltd. ("Golden Bird") (together, "mandatory respondents" or "respondents") are the two largest exporters of Chinese fresh garlic by volume and were the two mandatory respondents selected by Commerce for individual examination in the administrative review.  Mem. from Christian Marsh to Ronald K. Lorentzen at 3, PD 189 at bar code 3108743-01 (Dec. 3, 2012), ECF Dkt. No. 28.

Plaintiffs argue that the source Commerce selected to establish the price for the surrogate value of the raw garlic bulbs was less specific to the level of trade at which respondents purchased their garlic bulbs than other record evidence.  *See* Mem. of Law in Supp. of Pls.' Mot.

for J. on the Agency R. 25 (ECF Dkt. No. 35-1) ("Pls.' Br."). Thus, according to plaintiffs, the

value was not based on the best available information as to the surrogate price for the raw garlic

bulbs. Defendant United States and mandatory respondents maintain, among other things, that,

because the selected source used to price the garlic bulbs was based on a broad market average, it

represented the best available information. *See* Def.'s Resp. to Pls.' Mot. for J. upon the Agency

R. 1–2, 5 (ECF Dkt. No. 39); Def.-int. Shenzhen Xinboda Industrial Co., Ltd.'s Resp. to Pls.'

Mot. for J. upon the Agency R. 1 (ECF Dkt. No. 41); Resp. of Def.-int. Hebei Golden Bird

Trading Co., Ltd. to Pls.' Mot. for J. on the Agency R. 2 (ECF Dkt. No. 40). The court has

jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii).

     For the reasons set forth below, the Final Results are sustained.


## BACKGROUND

     In 1994, Commerce issued an antidumping duty order on imports of fresh garlic from the

PRC. Fresh Garlic From the PRC, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994)

(antidumping duty order) (the "Order").[1] On November 30, 2011, plaintiffs asked Commerce to

conduct an administrative review of the Order. Letter from Michael J. Coursey & John M.

Herrmann, Kelley Drye & Warren LLP, to Secretary of Commerce, U.S. Department of

Commerce at 1, PD 12 at bar code 3043695-01 (Nov. 30, 2011), ECF Dkt. No. 28. Commerce

then began its seventeenth annual administrative review of the Order for the period of review

---

[1]    The products subject to the Order "are all grades of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen, provisionally preserved, or packed in water or other neutral substance, but not prepared or preserved by the addition of other ingredients or heat processing. The differences between grades are based on color, size, sheathing and level of decay." Order, 59 Fed. Reg. at 59,209.

November 1, 2010 through October 31, 2011 ("POR"), choosing Golden Bird and Xinboda as mandatory respondents. *See* Issues & Dec. Mem. 1, 4.

During the review, as proposed sources from which to calculate the surrogate value for the raw garlic bulbs, the primary input for the subject merchandise, the parties placed on the record several sets of data from various sources, including (1) 2009 Ukrainian garlic producer prices provided by the United Nations' Food and Agricultural Organization's Statistical Division ("FAO")[2] and (2) daily garlic prices from eight regional markets in Ukraine during the POR, published by Fruit-Inform[3] ("FI"). *See* Mem. from David Lindgren, International Trade Compliance Analyst, to The File at 4, PD 193 at bar code 3108863-02 (Dec. 3, 2012), ECF Dkt. No. 28 ("Prelim. Surrogate Values Mem.").

In the Final Results, Commerce found that the FAO price "represent[ed] the broadest market average" because it was "a single annual price intended to represent all Ukrainian garlic production." Issues & Dec. Mem. at 15. Commerce concluded that the FAO price represented a broader market average than the FI data because "while the FI price data represent[ed] 18

---

[2]        The FAO data is "compiled with the cooperation of governments, who provide the data in the form of replies to annual . . . questionnaires," and is comprised of "prices received by farmers (called Producer prices) for primary crops . . . at the point of initial sale (prices paid at the farm-gate)." Issues & Dec. Mem. at 13 (quoting Letter from Gregory S. Menegaz, deKieffer & Horgan, PLLC, to Hon. Rebecca M. Blank, Acting Secretary of Commerce at Ex. 8, PD 140 at bar code 3091369-03 (Aug. 10, 2012), ECF Dkt. No. 28) (internal quotation marks omitted). The FAO website, however, "notes that, when countries do not collect farm-gate prices, they also may provide wholesale prices and unit values compiled for national accounts." Issues & Dec. Mem. at 13.

[3]        "Fruit-Inform . . . is [a] consulting fruit and vegetable business agency" that "provides services to agrarian companies throughout the world and specializes in market information, market analyses, and in coordinating and organizing high-profile fresh produce industry events." *About Us*, FRUIT-INFORM, http://www.fruit-inform.com/en/about (last visited June 24, 2015).

percent of all Ukrainian production, the [FAO] price [was] intended to represent all Ukrainian-produced garlic."  Issues & Dec. Mem. at 15.

Commerce also found that, although the FAO price was "intended to be a farmgate price," i.e., a price that includes the costs of production, but not additional costs such as processing, it "may reflect some other measures as well," i.e., could reflect some shipping, processing, or storage of the garlic bulbs.[4]  *See* Issues & Dec. Mem. at 14.  As to the FI prices, Commerce characterized these as being closer to wholesale prices, because the garlic had gone

---

[4]      Commerce seems to have based this finding on information from the FAO website:

> The [FAO] data are compiled with the cooperation of governments, who provide the data in the form of replies to annual FAO questionnaires.  These data are "prices received by farmers (called Producer prices) for primary crops . . . at the point of initial sale (prices paid at the farm-gate)."  The [FAO] website notes that, when countries do not collect farm-gate prices, they also may provide wholesale prices and unit values compiled for national accounts.  Likewise, the organization notes that, in some cases, the data provided in the questionnaire responses are also supplemented with official country publications and institutional databases.

Issues & Dec. Mem. at 13 (alteration in original) (footnotes omitted) (quoting Letter from Gregory S. Menegaz, deKieffer & Horgan, PLLC, to Hon. Rebecca M. Blank, Acting Secretary of Commerce at Ex. 8, PD 140 at bar code 3091369-03 (Aug. 10, 2012), ECF Dkt. No. 28 ("FAO Submission")).  Indeed, the FAO website printout on the record states that "[w]hen countries do not collect farm-gate prices they provide an alternative set of data, mainly: (1) wholesale prices; (2) unit values compiled for national accounts."  FAO Submission.  The court notes that plaintiffs are correct that, because the FAO website printout on the record states that reported wholesale prices are indicated as such, the FAO data does not likely include wholesale prices.  *See* FAO Submission ("In a few cases, countries have supplied wholesale prices.  These exceptions are documented in connection with the countries in question (footnotes).").  In other words, there is at least some indication that, when reported prices are not farmgate prices, it is noted.  The printout on the record, however, does not state that any other "alternative" or supplemental data would be clearly identified as such.  Moreover, the FAO website submission does reveal the potential for "other measures" to be reflected in its prices in a list of limitations, including differences between countries as to point-of-sale, product-specific practices, and "methods of arriving at national averages."  *See* FAO Submission.  Thus, as Commerce noted, the exact level of trade and processing of the garlic sold for the prices reported to the FAO, and on which the average Ukrainian price used here was based, is not clearly stated.

through "some level of preparation, transport and possibly storage" prior to sale.  *See* Issues &

Dec. Mem. at 14.

As to the level of trade at which mandatory respondents acquired their garlic bulbs,

Commerce found "that the raw garlic purchased by both Golden Bird and Xinboda [was] not

farmgate in nature."  Issues & Dec. Mem. at 15.  As shall be seen, this conclusion was based on

the Department's finding that the raw garlic had undergone at least some processing.  When it

tried to match the level of trade of mandatory respondents' purchases to the surrogate value on

the record, therefore, Commerce concluded that both the FAO and FI prices were at a different

level of trade than those purchases and the Department did not have enough information to

determine which one was more similar to respondents' purchases.  *See* Issues & Dec. Mem. at

15.  In other words, for Commerce, neither source represented data at precisely the level of trade

at which the respondents bought their garlic.

Relying on the FI data, in the Preliminary Results, Commerce calculated weighted

average margins of $1.96/kg for Xinboda and $1.65/kg for Golden Bird.  Fresh Garlic From the

PRC, 77 Fed. Reg. 73,980, 73,981 (Dep't of Commerce Dec. 12, 2012) (preliminary results of

antidumping duty administrative review; 2010–2011) ("Preliminary Results").  In the Final

Results, however, Commerce relied on the FAO data for garlic bulb input prices and calculated

dumping margins of zero for both mandatory respondents.  Final Results, 78 Fed. Reg. at 36,169.


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "The existence of substantial evidence is determined 'by considering the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.'" *Fuyao Glass Indus. Grp. Co. v. United States*, 30 CIT 165, 167 (2006) (quoting *Huaiyin*, 322 F.3d at 1374) (internal quotation marks omitted). The court's function, however, "is not to reweigh the evidence but rather to ascertain 'whether there was evidence which could reasonably lead to the [agency's] conclusion.'" *See Am. Bearing Mfrs. Ass'n v. United States*, 28 CIT 1698, 1700, 350 F. Supp. 2d 1100, 1104 (2004) (quoting *Matsushita Elec. Indus. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). Moreover, "[t]he possibility of drawing two equally justifiable, yet inconsistent conclusions from the record does not prevent the agency's determination from being supported by substantial evidence." *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Grp. Corp. v. United States*, 32 CIT 673, 674 (2008) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

## DISCUSSION

### I.   LEGAL FRAMEWORK

As part of its unfair trade regime, "[t]he United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value." *Clearon Corp. v. United States*, 37 CIT __, __, Slip Op. 13-22, at 4 (2013). Under 19 U.S.C. § 1675(a)(1)(B), once an antidumping duty order has been issued, "[a]t least once during each 12-month period beginning on the anniversary of the date of publication of . . . an antidumping duty order,"

Commerce shall, upon request and after publication of notice of review, "review, and determine . . . the amount of any antidumping duty." 19 U.S.C. § 1675(a)(1)(B). The Department is responsible for making the fair value determination, and is directed by statute to make a "comparison . . . between the export price or constructed export price[5] and normal value.[6]" *Id.* § 1677b(a). Where, as here, the merchandise in question is exported from a nonmarket economy country,[7] "the normal value of the subject merchandise [is based on] the value of the factors of production utilized in producing the merchandise and [an] added . . . amount for general

---

[5]        "Export price" and "constructed export price" are defined as follows:
        The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .
        . . . .
        The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . .
19 U.S.C. § 1677a(a), (b).

[6]        "The [normal value] of subject merchandise is 'the price at which the foreign . . . product is first sold . . . for consumption . . . in the usual commercial quantities and in the ordinary course of trade . . . at the same level of trade as the export price . . . .'" *Sichuan Changhong Elec. Co. v. United States*, 30 CIT 1481, 1485, 460 F. Supp. 2d 1338, 1343 (2006) (alterations in original) (quoting 19 U.S.C. § 1677b(a)(1)(B)(i)).

[7]        A nonmarket economy country is a "foreign country that the [Department] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). Because the Department deems the PRC "to be a nonmarket economy country, Commerce generally considers information on sales in [the PRC] and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* §

1677b(c)(1).

To value the factors of production in a nonmarket economy situation, Commerce is

directed to use "the best available information regarding the values of such factors [of

production] in a [comparable] market economy country or countries considered to be appropriate

by the [Department]." *Id.* The Department's task is to "attempt to construct a hypothetical

market value" of the subject merchandise in the nonmarket economy. *Nation Ford Chem. Co. v.

United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

As it has done in the past and because "Golden Bird and Xinboda reported raw garlic

bulb[] inputs, rather than garlic seed and growing factors, as [factors of production]," the

Department "applied an intermediate input methodology to the [normal value] calculation." *See*

Prelim. Surrogate Values Mem. at 2; *see also* Mem. from David Lindgren, International Trade

Compliance Analyst, to Nicholas Czajkowski, Acting Program Manager at 2, PD 192 at bar code

3108863-01 (Dec. 3, 2012), ECF Dkt. No. 28 ("Intermediate Input Methodology Mem.") ("In

this review, [Golden Bird] and [Xinboda] have reported in their questionnaire responses that

their respective processors purchased raw garlic bulbs, the intermediate input, from local farmers

and suppliers to produce the merchandise under review. As such, rather than attempt to

construct the costs of production to arrive at a value of raw garlic bulb inputs, the Department

will instead apply [surrogate values] to the raw garlic bulb in the [normal value] calculation.").

"In other words, rather than basing normal value on the sum of the surrogate values for the

upstream factors of production reported by respondents, such as costs associated with leasing

land, fertilizer, irrigation, labor, and the like, Commerce assumed that these costs were all

contained in the price of the intermediate product," here, the raw garlic bulb.  *See Qingdao Sea-line Trading Co. v. United States*, 37 CIT __, __, Slip Op. 13-102, at 6 (2013).

Commerce selected data from Ukraine because (1) it was among the countries the Department had identified as economically comparable to the PRC, (2) it was a significant producer of comparable merchandise, and (3) there was Ukrainian data Commerce could use to value the factors of production that was "both available and reliable."  *See* Issues & Dec. Mem. at 11 ("Once the Department has identified the countries that are the most economically comparable to the PRC, it identifies those countries which are significant producers of comparable merchandise.  From the countries which are both economically comparable and significant producers the Department will then select a primary surrogate country based upon whether the data for valuing [factors of production] are both available and reliable."); *see also* 19 U.S.C. § 1677b(c)(4)(A) ("The [Department], in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country . . . .").

II.     **THE DEPARTMENT'S SELECTION OF THE SURROGATE VALUE FOR THE RAW GARLIC BULB INPUTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

In the Final Results, using its intermediate input methodology, Commerce selected a surrogate value for raw garlic bulbs from Ukraine based on the FAO price information.  Because the information was for the period January 1, 2009 to December 31, 2009 and, thus, not precisely contemporaneous with the POR (November 1, 2010 through October 31, 2011), it then indexed the price using the Ukrainian Consumer Price Index.  *See* Letter from David Lindgren,

International Trade Compliance Analyst, to The File at 2, PD 299 at bar code 3139936-01 (June

10, 2013), ECF Dkt. No. 28.

Prior to its decision to use the FAO data, Commerce evaluated the proposed sources for

raw garlic bulb prices on the record according to the five factors it typically considers when

selecting the best available information: (1) public availability, (2) product specificity, (3) broad

market average, (4) tax and duty exclusivity, and (5) contemporaneity of the data.  Issues & Dec.

Mem. at 12–17; *see also Jining Yongjia Trade Co. v. United States*, 34 CIT 1510, 1521 (2010)

(citation omitted).

Plaintiffs challenge Commerce's determination to use the FAO data, rather than the FI

data, to calculate the surrogate value for the raw garlic bulb inputs.  At the outset, the court notes

that no party challenges Commerce's finding that both the FAO and FI data are publicly

available and reflect prices specific to the type of garlic that mandatory respondents buy.[8]

Further, no party disputes Commerce's finding that the FAO data is tax exclusive and that it

represents the broadest market average.  Rather, here, plaintiffs argue that the Department's

selection of the FAO data is unsupported by substantial evidence because the data (1) reflects

"farmgate" prices that "[a]re [*n*]*ot* [s]pecific to the [l]evel of [t]rade [a]t [w]hich the

[r]espondents[] . . . [a]cquire [i]nput [b]ulbs" and (2) is not contemporaneous with the POR.  *See*

Pls.' Br. 25, 29.

---

[8]        Because Commerce "found that garlic harvested in Ukraine is typically of the
large variety that is similar to respondents' Chinese garlic and no party [had] contest[ed] this
conclusion," the Department found that "both the FI and [FAO] prices for Ukrainian garlic
[were] specific to Chinese garlic."  *See* Issues & Dec. Mem. at 13, 15.  Indeed, "[p]laintiffs do
not contest the Department's findings with respect to the physical comparability of fresh garlic
grown in Ukraine and China."  Pls.' Br. 18.

### A.  The FAO Data is the Best Available Information

#### 1.  Broad Market Average

While there is no particular hierarchy employed by Commerce when assessing the five

factors it typically uses when selecting the best available information to value factors of

production, at times consideration of one factor can largely direct the Department's decision.

Such is the case here.

With respect to broad market average, Commerce determined that the FAO price

represents a broader market average for the raw garlic bulb input than the FI price.  In the Final

Results, Commerce determined that the "[FAO] price . . . represent[s] the broadest market

average" because "the [FAO] price is a single annual price intended to represent all Ukrainian

garlic production," whereas the FI price data only accounts for 18 percent of all Ukrainian garlic

production.  Issues & Dec. Mem. at 15.  Commerce then stated that, in its Preliminary Results, it

"used the FI data because [it had] found its eight markets, spread throughout the country,

represented a broad market average," but that the Department had since discovered by way of "a

declaration by the director of FI . . . that the FI prices represent about 18 percent of all garlic

cultivated in Ukraine."  Issues & Dec. Mem. at 15.  This finding is supported by a letter on the

record from FI's "Head of Project," which "caution[s] that merely 18% of fresh garlic cultivated

in Ukraine arrives at the wholesale markets reported by [FI]."  Letter from Gregory S. Menegaz,

deKieffer & Horgan, PLLC, to Hon. Rebecca M. Blank, Acting Secretary of Commerce at Ex. 1

at 2, PD 216 at bar code 3119135-01 (Feb. 12, 2013), ECF Dkt. No. 28.

Commerce supported its finding that the FAO price was intended to represent all

Ukrainian garlic production by referencing the FAO website submission on the record.  *See*

Issues & Dec. Mem. 13, 15; *see also* Letter from Gregory S. Menegaz, deKieffer & Horgan,

PLLC, to Hon. Rebecca M. Blank, Acting Secretary of Commerce at Ex. 8, PD 140 at bar code

3091369-03 (Aug. 10, 2012), ECF Dkt. No. 28 ("FAO Submission") ("FAO collects annually the

average prices from the countries on an annual basis. . . . The concept 'prices received by

farmers' in the present data series refers to the national average prices of individual commodities

comprising all grades, kinds and varieties received by farmers in the nearest market.").

Because the FAO price, as a national average annual price, represents all Ukrainian garlic

production over the entire year, while the FI price only accounts for a small fraction of Ukrainian

garlic production from regional markets, it was reasonable for Commerce to find that the FAO

price represents a broader market average than the FI data and to favor the use of the FAO data

to value the raw garlic bulbs. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 618

F.3d 1316, 1322 (Fed. Cir. 2010) ("Commerce's policy on using countrywide data, whenever

available, is reasonable, as such data gives a broad overview of the relevant market."); *Jining

Yongjia*, 34 CIT at 1527–28 (noting that "it is Commerce's practice to use country-wide data

instead of regional data when the former is available" and finding Commerce's decision to use

data as a broad market average to be supported by substantial record evidence (citations

omitted)); *see also Jacobi Carbons AB v. United States*, 38 CIT __, __, 992 F. Supp. 2d 1360,

1368–69 (2014) (finding prices from a publication lacking countrywide data to be less

representative of broad market averages than nationwide data for imports that entered the

surrogate country from its global trading partners); *Since Hardware (Guangzhou) Co. v. United

States*, 37 CIT __, __, 911 F. Supp. 2d 1362, 1377 (2013) (stating that Commerce explained that

two data sources were "deficient," in part, by "fail[ing] to represent a broad market average

because they [were] from only two companies").

Here, only a small proportion of the Ukrainian garlic bulb market is reflected in the FI

data and that the data is based on regional prices, whereas the FAO data is for the whole country

and represents an average price for all domestic garlic production.  Thus, it is apparent, and no

party disputes, that the broad market average factor strongly supports Commerce's selection of

the FAO data over the FI data.

### 2.  *Tax and Duty Exclusivity*

The tax exclusivity factor also favors the Department's determination.  In the Final

Results, Commerce found that, based on the record evidence, the FAO price was tax exclusive,

but that "there [was] some lack of clarity regarding" whether the FI prices were tax exclusive.

*See* Issues & Dec. Mem. at 16.

Specifically, Commerce found that,

> [w]ith respect to the [FAO] price, we concur with Xinboda that it
> necessarily must be tax exclusive, based on the statement on the [FAO's] website
> which states that "[p]rices of agricultural products and by-products have a
> significant influence on formulation of production plans and policy decisions
> relating to taxes levied on agricultural income and subsidies provided to farmers
> on agricultural inputs."  It is reasonable to conclude that the [FAO] price would
> be tax exclusive if the data is utilized for the purposes of levying taxes.
> Accordingly, record evidence leads the Department to a determination that the
> [FAO] price is, in fact, tax exclusive.

Issues & Dec. Mem. at 16–17 (alteration in original) (footnote omitted) (quoting FAO

Submission).  Regarding the FI prices, on the other hand, Commerce found that

> FI's director clearly states on the record of this proceeding that the FI prices are
> tax exclusive because the small farmers and traders selling at the markets captured
> by FI are not required to pay VAT.[9]  [Nonetheless,] Golden Bird contends that

---

9        "The VAT, or the value-added tax, is '[a] tax on the estimated market value added
to a [product] or material at each stage of its manufacture or distribution, ultimately passed on to
the consumer,'" which "is normally a percentage of the estimated market value added."  *Beijing*

(footnote continued)

> because Ukraine law requires a 20 percent VAT on agricultural products, the FI prices are obligated to include taxes.  No party disagrees with the fact that Ukrainian law requires 20 percent VAT to be paid on agricultural products.  However, FI's director states that the prices reported by FI are exclusive of VAT and no party has provided any evidence which demonstrates that any of the FI-reported prices are, in fact tax inclusive.  While Xinboda does contend that because commercial farmers are selling garlic through markets reported by FI (their distance sales would necessarily include VAT), it is not clear that the distance sales made by commercial farmers in Ukraine are inclusive of VAT.

Issues & Dec. Mem. at 16 (footnotes omitted) (citing Letter from Michael J. Coursey & John M. Herrmann, Kelley Drye & Warren LLP, to Acting Secretary of Commerce at Ex. 1 ¶ 11, PD 248 at bar code 3119204-01 (Feb. 12, 2013), ECF Dkt. No. 28. ("FI Decl.")).  Faced with evidence that (1) the FI director stated that the FI prices are tax exclusive, (2) it was clear that a 20 percent VAT was required by law, and (3) the argument that sales away from the farmgate must have included the VAT, Commerce determined that the record was unclear as to whether the FI garlic bulb prices are tax exclusive.  *See* Issues & Dec. Mem. at 16 ("Therefore, while there is some lack of clarity regarding the VAT in FI, it is . . . uncontested that [FAO] data are tax exclusive.").

Commerce's findings regarding the tax exclusivity of the data were not unreasonable.  Given the statement on the FAO website that "[p]rices of agricultural products and by-products have a significant influence on . . . policy decisions relating to taxes levied on agricultural income," Commerce's conclusion that, because the FAO data was used in levying taxes, it must be tax exclusive, was not unreasonable.  *See* FAO Submission.  Further, the court agrees with Commerce that the record is somewhat unclear as to whether the FI data is tax exclusive because Ukrainian law requires 20 percent VAT to be paid on agricultural products, such as those sold at the markets reporting to FI.  Thus, while by no means free of ambiguity, and not as determinative

---

*Tianhai Indus. v. United States*, 39 CIT __, __ n.12, 52 F. Supp. 3d 1351, 1357 n.12 (2015) (alteration in original) (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1900 (4th ed. 2000)).

as the broad market average factor, the tax exclusivity factor modestly favors Commerce's

findings.

### 3.   Level of Trade and Contemporaneity

As noted, plaintiffs argue that the Department's selection of the FAO data is unsupported

by substantial evidence because the data is (1) for sales of garlic at a different level of trade than

mandatory respondents' garlic bulb inputs and (2) not contemporaneous with the POR.

In the context of their level of trade argument, plaintiffs maintain that "the Department's

reliance on the . . . prices for fresh garlic in Ukraine, as published by the FAO, is inconsistent

with its findings in the immediately prior [fifteenth] and [sixteenth] administrative reviews," and,

further, in the seventeenth review (i.e., for the POR), that Xinboda and Golden Bird did not

purchase raw garlic bulbs at the farm gate.  *See* Pls.' Br. 18.  Thus, plaintiffs' argument is that

the Department should not have relied on the FAO "farmgate" data because it (1) relied on

wholesale price data in the two immediately preceding reviews and (2) determined that, in this

review, mandatory respondents' garlic bulb inputs were not obtained at the farm gate.

Plaintiffs also argue that Commerce's "decision to use the non-contemporaneous FAO

data over the contemporaneous [FI] data is . . . not based on substantial . . . evidence."  Pls.' Br.

29.  To support this argument, plaintiffs point to Commerce's statement in the Final Results that

it generally "prefers contemporaneous data over non-contemporaneous data, all other factors

being equal."  Pls.' Br. 29 (quoting Issues & Dec. Mem. at 15–16) (internal quotation marks

omitted).

With respect to the fifteenth and sixteenth annual reviews, plaintiffs are correct that

Commerce relied on wholesale (not farmgate) prices when constructing normal value.  *See* Fresh

Garlic From the PRC, 76 Fed. Reg. 37,321 (Dep't of Commerce June 27, 2011) (final results and

final rescission, in part, of the 2008–2009 antidumping duty administrative review), and

accompanying Issues and Decision Memorandum at cmt. 3; Fresh Garlic from the PRC, 77 Fed.

Reg. 34,346 (Dep't of Commerce June 11, 2012) (final results of the 2009–2010 administrative

review of the antidumping duty order), and accompanying Issues and Decision Memorandum at

cmt. 5.[10]

---

[10]        The Department stated in the sixteenth review that
        [t]he fact that a significant portion of the raw garlic inputs processed by
the respondents must have also been cold/[cold atmosphere] stored further
demonstrates that neither company makes its purchases at farmgate prices.
Xinboda has stated that "in the months other than the harvest season, [Xinboda's
processor] also purchased from farmers who rented space and stored the raw
garlic inputs in cold storage facilities. . . ."  Golden Bird has similarly stated that
"no matter how long the raw garlic was kept in cold storage, the costs had been
included in the purchase price" paid by Golden Bird's processor . . . . As noted in
Xinboda's statement, farmers rented space for cold storage thus indicating that the
cold storage facilities were not located on the farms that supplied the raw garlic
inputs.  While there is no evidence on the record showing where the cold storage
facilities that stored the raw garlic inputs purchased by the respondents were
located, the fact that the very use of the storage facilities would have resulted in
additional costs being incurred on the part of the seller.  Therefore, that both
respondents report purchasing raw garlic inputs from local farmers does not
address the issue that these local farms had to clean, sort and bag the harvested
raw garlic, rent space to store the raw garlic, cover the costs of storing the raw
garlic (*i.e.*, electricity, labor) and pay for the transportation and other related costs
of moving the raw garlic to the cold storage facility and then sometimes
delivering the raw garlic inputs from the cold storage facility to the respondent's
processing plants.  Regardless of the amount of the costs involved, it is reasonable
to conclude that the party incurring these costs would have added them to any
price charged for the corresponding garlic; Golden Bird's statements support this
conclusion.  As such, the prices paid by the respondents for any raw garlic inputs
are not farmgate prices as defined in *Jinan Yipin*.
Fresh Garlic from the PRC, 77 Fed. Reg. 34,346, and accompanying Issues and Decision
Memorandum at cmt. 5 (alteration in original) (footnotes omitted) (citation omitted).

Also, in this seventeenth annual review of the Order, Commerce "continue[d] to find that the raw garlic purchased by both Golden Bird and Xinboda is not farmgate in nature."  Issues & Dec. Mem. at 15.  In reaching this conclusion, the Department made the following observations:

> Department officials conducted verification of Golden Bird during the instant review and, as part of verification, visited some of Golden Bird's producer's suppliers.  It is clear from verification that while the suppliers may be farmers, the garlic they are selling to Golden Bird's producer has already been cleaned, transported, and kept in cold storage.
>
> Likewise, while we did not verify Xinboda, we note that the fact that Xinboda was able to purchase garlic throughout the POR indicates that the garlic its producer purchases has been stored and therefore reflects a level of trade/processing beyond the farmgate. . . .  As such, Xinboda's raw garlic has also been subject to some level of preparation (*i.e.*, bagging to be placed in storage) as well as transportation or labor to place the garlic in cold storage[].  *Accordingly, the Department continues to find that the raw garlic purchased by both Golden Bird and Xinboda is not farmgate in nature.*

Issues & Dec. Mem. at 14–15 (emphasis added).  Based on these findings and consistent with its findings in the two prior reviews, here, Commerce continued to find that Xinboda's and Golden Bird's garlic bulb inputs were not obtained at the farm gate.  Its use of the FAO price, which it determined "is closer to a farmgate price," in this review was therefore inconsistent with its use of wholesale prices to value the garlic bulb inputs in the prior reviews, seems to be at odds with its level of trade findings in this review, and, thus, requires at least some explanation.  Issues & Dec. Mem. at 15.

In the Final Results, Commerce also discussed contemporaneity and addressed the non-contemporaneity of the FAO data, which is from calendar year 2009.  Acknowledging that the FAO data was not contemporaneous to the POR, Commerce noted that the FAO data was close in time to the POR and argued that, although "the markets may have changed, there [was] no evidence indicating that the 2009 price, indexed to the POR, [was] any less indicative of the price of garlic in Ukraine as a result of market development in the intervening time period."

Issues & Dec. Mem. at 16.  The Department also stated that it had "placed information on the record in the Preliminary Results [that] provided a method of inflating non-contemporaneous prices" and that "no party ha[d] disputed [the] information."  Issues & Dec. Mem. at 16.  Put another way, Commerce found that the earlier FAO data was relatively close in time to the POR, that there was no record evidence that the market for garlic had gone through a substantial change that would have dramatically altered the price, and that, because none of the parties raised any questions concerning its method of inflating non-contemporaneous prices, it was reasonable for the Department to use that method to index the FAO data for inflation.

Commerce's findings as to both level of trade and contemporaneity were not unreasonable.  First, as has been noted, Commerce determined that respondents' garlic bulb inputs were not purchased at farmgate prices.  Rather, mandatory respondents paid prices at a more advanced level of trade.  *See* Issues & Dec. Mem. at 14 ("While Xinboda and Golden Bird both contend that their garlic is obtained at the farmgate, . . . [i]t is clear from verification that while [Golden Bird's] suppliers may be farmers, the garlic they are selling to Golden Bird's producer has already been cleaned, transported, and kept in cold storage.  Likewise, . . . the fact that Xinboda was able to purchase garlic throughout the POR indicates that [its] garlic . . . has been stored and therefore reflects a level of trade/processing beyond the farmgate.").

It is also apparent that the FAO prices are likely close to farmgate prices, although there is at least some evidence indicating that they reflect a more advanced level of trade themselves.  That is, Commerce correctly noted that the FAO price used here "may reflect some other measures as well."  *See* Issues & Dec. Mem. at 14.  While there is some indication that there would be a note accompanying FAO data that contained costs beyond the farm gate, whether the actual data contains this level of detail is unclear.  *See* FAO Submission ("Most of the data

originated from country sources received through the FAO Questionnaire . . . on prices received

by farmers.  In some cases data was supplemented with official country publications and

institutional databases. . . . In actual practice it has been noted that (a) data might not always

refer to the same selling points depending on the prevailing institutional set-up in the countries,

(b) different practices prevail in regard to sale of individual commodities, (c) methods of arriving

at national averages also differ from one country to another, and (d) as many countries do not

collect producer prices[ (i.e., prices determined at the farm gate or first-point-of-sale

transactions)], unit values used in the compilation of national accounts aggregates has been taken

as the nearest approximation.").

As to the level of trade of the FI prices, website printouts of several of the regional

markets on the record, as well as a declaration made by FI's editor-in-chief, support the

conclusion that they are wholesale prices.  *See* Letter from Michael J. Coursey & John M.

Herrmann, Kelley Drye & Warren LLP, to Secretary of Commerce at Attachments 1–6, PD 144–

148 at bar code 3091519-01–05 (Aug. 10, 2012), ECF Dkt. No. 28 ("Market Website Printouts").

That is, the prices were for garlic that had already been, at minimum, sorted by bulb size,

packaged in mesh bags, stored, and transported to the market.  *See* FI Decl. ¶¶ 12, 18–20 ("There

are no price surcharges for transportation, storage, or packaging costs.  These expenses

[(transportation, storage, and packaging costs)] are covered by the farmer selling at the market

and reflected in the wholesale price. . . . Before it is sold on the wholesale markets, fresh garlic is

sorted by bulb size and is packed in mesh bags.").

Importantly, however, the evidence found on these websites further indicates that the

farmers selling their produce at each of these markets pay fees to the markets, including entrance

fees and parking fees, that would likely be reflected in the prices paid by a buyer.  *See* Market

Website Printouts.  This conclusion is supported by a declaration on the record made by FI's

editor-in-chief, which states that "individuals or entities selling fresh garlic on the *wholesale*

markets monitored by [FI] are required to pay an entrance fee (or a trading platform fee)" and

"[t]he amount of the fee depends on the class and size of the seller's vehicle and, thus, is related

to the volume of goods offered by the seller."  FI Decl. ¶ 15 (emphasis added).  Indeed, in the

Preliminary Results, where Commerce used the FI data, the FI prices were adjusted to take into

account (remove) the costs represented by these fees.[11]  Thus, the FI prices likely included costs

not paid by mandatory respondents when they purchased their raw garlic bulbs,[12] while the FAO

data did not include costs that were included in respondents' purchase prices.

---

[11]     In the Preliminary Results, Commerce adjusted the FI prices downward to reflect
added costs:

>      Per the Department's practice, we find that it is appropriate to make
> adjustments to the [FI] price to offset any possible mark-ups and/or selling fee
> that may not be reflective of the respondent's experience.  Petitioners have placed
> printouts from the websites of four of the eight markets on the record.  *These*
> *websites all indicated that selling through middlemen in these markets would*
> *result in a mark-up of 10 to 30 percent at the market.  Additionally, these websites*
> *indicate that farmers are charged* [*a*] *parking fee.*  As noted above, it is not clear
> whether the [FI] prices include any taxes and/or duties.  If the prices reflect any
> intermediary trading, there also exists a possibility that taxes and duties may have
> been added to the price.  Therefore, to account for the possible mark-ups, fees,
> taxes[,] and duties that may be reflected in the [FI] price, the Department has
> determined that it will subtract the average of the possible mark-up as stated in the
> websites placed on the record by Petitioners.  On this basis, the Department has
> removed 20 percent from the average POR price to account for any mark-ups,
> fees, etc.  Finally, the Department subtracted 0.17 percent to account for the
> parking fee charged.

Prelim. Surrogate Values Mem. at 6–7 (emphasis added) (footnotes omitted).

[12]     The court notes that the transactions involving the raw garlic bulbs actually
occurred between mandatory respondents' respective processors and local farmers and suppliers.
*See* Intermediate Input Methodology Mem. at 2 ("In this review, [Golden Bird] and [Xinboda]
have reported in their questionnaire responses that their respective processors purchased raw
garlic bulbs, the intermediate input, from local farmers and suppliers to produce the merchandise
(footnote continued)

Although it departs from the nature of the surrogate prices used in the two prior

administrative reviews, Commerce was not unreasonable in its conclusion that the FAO data was

the best available information on the record to value the raw garlic respondents purchased.

Commerce found that "both the [FAO] price and the FI price data appear to be at a

different level of trade and processing than respondents' purchases and, without more

information, it is not possible to determine whether one is more similar to respondent[s']

purchases of processed garlic bulb over the other." Issues & Dec. Mem. at 15. That is, it is not

clear at precisely what level of trade respondents' raw garlic was purchased or the level of trade

the FAO and FI data each represent. Put another way, on a level of trade spectrum with garlic

purchased at farmgate prices (i.e., garlic that has undergone no processing) as one extreme and

garlic purchased at wholesale prices (i.e., garlic that has undergone significant processing,

storage, transportation, and payment of brokers' fees) as the other, mandatory respondents' garlic

bulb purchases appear to be somewhere in the middle. In like manner, where the FAO and FI

transaction prices fall on the spectrum is not precisely known.

It may be the case that the evidence would shade mandatory respondents' purchases

toward the wholesale end of the spectrum and that another fact-finder might have found the FI

data to more closely reflect the level of trade at which respondents made their purchases. The

level of trade reflected by the FI data is sufficiently vague, however, that, faced with the

imperfect information on the record, Commerce's choice of the FAO data was not unreasonable.

This is because the FAO data might well reflect prices for merchandise sold beyond the farm

under review."). In other words, the raw garlic bulb inputs were acquired by respondents'
processors and processed at their plants prior to being transferred to Xinboda and Golden Bird.

gate and the FI data appears to contain costs greater than those contained in the prices paid by

mandatory respondents.

The court also agrees with the Department's contemporaneity conclusions and finds that,

under the circumstances, indexing the FAO price to the POR was reasonable.  This is because the

FAO data was from calendar year 2009, which is relatively close in time to the POR (November

1, 2010 through October 31, 2011), no record evidence indicated that the market for garlic had

substantially changed since 2009, and no party objected to Commerce's method of indexing the

price for inflation.

More importantly, with respect to the Department's ultimate conclusions, however,

plaintiffs' arguments ignore the other factors that Commerce typically considers when choosing

the best available information to value factors of production and that Commerce considered

those other factors in choosing the FAO price.  That is, were it in fact the case that all of the

factors Commerce considers when choosing a source for a surrogate price were equal,

contemporaneous data at a closer level of trade would have been preferred.  Here, however, all

other factors were not equal, as plaintiffs suggest, particularly with regard to the broad market

average and tax exclusivity factors.  Although the level of trade and contemporaneity of the FAO

data may not be perfect, the broad market average factor compels its use in this case because it

represents all Ukrainian garlic production, while the FI data covers a very small sample of the

market.  Moreover, as Commerce found, while there was evidence indicating that the FAO price

was tax exclusive, the tax exclusivity of the FI data was unclear.

Plaintiffs' arguments seem to invite the court to find that level of trade considerations are

necessarily more important than other factors considered by Commerce in making a best

available information on the record determination.  The record in this case, however,

demonstrates that the factors must be considered together.  Thus, while, if based solely on the

level of trade and contemporaneity factors, Commerce might reasonably have concluded that

they favored the use of the FI data, that the FAO data base was so much larger than that of the FI

data directs the result determined by Commerce.  In other words, while specificity as to the level

of trade and contemporaneity may be equivocal or even favor the FI data, the broad market

average factor (coupled with tax exclusivity) argues so strongly in favor of the FAO data that the

Department cannot be said to have erred by preferring it as the source of the surrogate value for

raw garlic.  Therefore, when proper weight is given to each of the factors, it is apparent that the

FAO data is the best available information.

Thus, because Commerce's selection of the surrogate value for raw garlic bulb inputs is

supported by substantial evidence, it is sustained.


## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results are sustained.  Judgment

will be entered accordingly.

Dated:          July 16, 2015
                New York, New York


                                        ____/s/ Richard K. Eaton_____
                                             Richard K. Eaton